Filed 7/18/23  P. v. Buchanan CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C095188 |
| Plaintiff and Respondent, | (Super. Ct. No. P19CRF0030) |
| v. | |
| JEFFREY KENNEDY BUCHANAN, | |
| Defendant and Appellant. | |

A jury found defendant Jeffrey Kennedy Buchanan guilty of one count of continuous sexual abuse of a child and seven counts of lewd acts upon a child under the age of 14 years.  The prosecution dismissed the count of continuous sexual abuse, and the trial court sentenced defendant to 16 years in state prison on the remaining lewd act counts.

Defendant appeals, arguing: (1) the trial court erred by excluding evidence bearing on the victim's credibility; (2) the trial court erred in admitting evidence of child sexual abuse accommodation syndrome (CSAAS) and instructing the jury with CALCRIM No.

1

1193 (Testimony on CSAAS); (3) the trial court erred in admitting his stepdaughter's testimony regarding prior acts of sexual abuse; (4) he received insufficient notice of three of the charges against him or, in the alternative, the evidence was insufficient to support the conviction on one of the ensuing counts; (5) the trial court erred in instructing the jury with CALCRIM No. 316 (additional instructions on witness credibility – other conduct), CALCRIM No. 361 (failure to explain or deny adverse evidence), and CALCRIM No. 1191A (evidence of uncharged sex offense); and (6) the trial court erred in imposing an upper term sentence without satisfying the requirements of Senate Bill No. 567 (2021-2022 Reg. Sess.; Senate Bill 567) (Stats. 2021, ch. 731, § 1.3). We will reject all but the last of these contentions and remand for resentencing.

## I. BACKGROUND

Jane Doe was born in March 2005. She was 16 years old when she testified at trial. Doe's mother and father are K. and J. K. and J. are divorced and share custody of Doe. J. remarried when Doe was seven or eight years old. J.'s new wife, A., became Doe's stepmother.[1] Defendant is A.'s stepfather.

Doe enjoyed a close relationship with A. and A.'s family. She spent weekends with an extended and blended family group that included defendant and his wife, H., J., and A. and their two young sons (Doe's half-brothers), and A.'s half-brother Ha. The group spent time at defendant's home in El Dorado Hills and a family cabin near Lake Tahoe. Doe spent the rest of her time with K. This arrangement continued for several years.

In March 2017, Doe told some school friends defendant had been touching her. Doe's friends alerted the school principal, who spoke with Doe and confirmed the allegations. The principal reported the matter to Child Protective Services (CPS) and

---

[1] J. and A. have since divorced.

2

spoke with law enforcement. Doe was interviewed by El Dorado County Sheriff's Department deputies and later participated in a multi-disciplinary interview (MDI) with a special investigator for the El Dorado County District Attorney's Office.

Defendant was arrested and charged by criminal complaint with one count of continuous sexual abuse of a child. (Pen. Code, § 288.5.)[2] Following a preliminary hearing, the prosecution filed an information charging defendant with one count of continuous sexual abuse of a child (§ 288.5, subd. (a)—count 1), six counts of lewd acts upon a child (§ 288, subd. (a)—counts 2-7), and two counts of forcible lewd acts upon a child (§ 288, subd. (b)(1)—counts 8-9). Defendant pled not guilty to all charges. The matter was tried to a jury in June and July 2021.

A.    *The Prosecution's Case in Chief*

The prosecution's case was presented mainly through testimony from Doe, her stepmother A., and Dr. Anna Washington, an expert on child sexual abuse and CSAAS.

   1.    *Doe's Testimony*

Doe testified that defendant touched her inappropriately on multiple occasions over a period of years, beginning when she was seven years old. She initially estimated that defendant touched her vagina between 10 to 15 times. However, she later said it may have been more, because defendant touched her almost every time she saw him, and she saw him often.

         a.    *Tongue Licking Incident*

Defendant's unwanted attentions began with a trip to the grocery store. Defendant bought Doe a bottle of juice. Afterwards, they sat in defendant's truck, and he asked for a taste. Doe started to pour some juice into another bottle, but defendant stopped her,

---

[2] Undesignated statutory references are to the Penal Code.

saying he wanted to taste the juice in " 'a different way.' " Defendant asked Doe to stick out her tongue. She did so, and defendant licked the juice off her tongue.

### b.  Camping Trailer Incident

Defendant and Doe returned to defendant's house after their trip to the grocery store. Defendant had recently bought a camping trailer, which was parked alongside the house. Defendant offered to show Doe around. They went inside, and defendant led Doe to a bedroom in the back. He stood behind Doe and pulled her shorts down. He groped her buttocks and touched her vagina. Moments later, defendant's wife, H., entered the trailer. Defendant pulled Doe's shorts up and greeted H. H. did not appear to suspect anything.

### c.  First Lake Tahoe Incident

The next incident occurred near Lake Tahoe, some months later. A group went to the cabin to enjoy the snow. The group included defendant and H., J. and A., Doe and two of her friends, and Ha., who was then 10 or 11 years old. One night, the children decided to watch a movie on defendant's laptop. They piled onto a bed in an upstairs loft area. Defendant stayed in the loft area and watched the movie. Doe recalled that he was kneeling by the bed, next to her. The other children lay on Doe's other side, under a comforter. Doe testified that defendant started touching her under the comforter. He started to digitally penetrate her, and she said, " 'ow.' " One of the other children asked what was wrong, and Doe replied, " 'Nothing[,] it must have been a bug.' "

### d.  Second Lake Tahoe Incident (Count 8)

The next incident occurred that same night, during the movie. Doe recalled that defendant was still kneeling on the floor next to the bed, when he took her hand and placed it inside his pants, at the base of his penis. The incident ended when Doe "ripped [her] hand away."

4

###### e.     Incident in Truck

The next incident took place on the drive home from Lake Tahoe.[3] Defendant was driving. Defendant's son, Ha., was sitting in the front passenger seat. Doe was sitting in the back seat, behind defendant. Defendant reached back and began rubbing Doe's lower leg and calf area.

###### f.     Babysitting Incident

The next incident took place when Doe was around nine years old. Doe testified that she had been babysitting her younger brothers at defendant's house. She was getting snacks for her brothers in the kitchen, when defendant appeared and motioned for her to come into the bedroom. Defendant stood behind Doe, breathing heavily. He then put his hands down her pants and touched her vagina.

###### g.     The Last Charged Incident

A final charged incident occurred in late 2016 or early 2017.[4] Doe was visiting defendant's home and found herself in a bedroom used by A. Defendant entered the room and starting to put his hands in Doe's pants. Defendant's hands grazed Doe's stomach, but she pushed him away and left the room before he was able to do more.

###### h.     Uncharged Incidents

Doe testified to several uncharged incidents in El Dorado and Lake Tahoe, only one of which need be mentioned here. Doe said she went to defendant's house for the last time in March 2017 and ran into the bedroom to retrieve a sweatshirt. Defendant

---

[3] Doe could not say whether they were returning from the same trip on which the previously described incidents occurred.

[4] As we shall see, there was some confusion about when the last charged incident occurred. Doe testified on direct examination that the last incident occurred a couple months before her birthday, in late 2016 or early 2017. On cross-examination, however, she said the incident occurred on November 16, 2016, which was consistent with her statements to El Dorado County Sheriff's officers.

grabbed Doe's wrist. Doe yanked her hand away and ran out of the room before anything could happen.

### 2. A.'s Testimony

A. met J. and Doe in 2009. She began sharing an apartment with J. in 2010 and gave birth to the first of their two sons that same year. Doe stayed with A. and J. during periods when J. had custody. They visited H. and defendant two or three times a week.

A. and J. separated in 2016. A. and her children moved into defendant's home in El Dorado Hills for several months. During this time, A. maintained a relationship with Doe and continued to see her occasionally, when J. or K. needed help with childcare. A. testified she had no reservations leaving the children at defendant's house. She noted, however, that she was leaving them with H., and not defendant.

A. became aware of Doe's allegations in March 2017. Sometime later, defendant, H., and Ha. all came to stay in A.'s apartment for several weeks. A. understood defendant was staying with her in order to avoid arrest.

A. maintained contact with Doe and learned more about her experiences with defendant. Ultimately, A. decided to confront defendant. She went to defendant's house and said, in substance, she "knew what he did to [Doe]." She also told defendant that he was "going to go to jail." According to A., defendant became hysterical, dropped to his knees, and said, " 'There is no evidence.' " H. then ordered A. to leave the house.

A. described an angry encounter with K. at her workplace—a law office—in March 2017. According to A., K. appeared at the office and demanded that A. provide a false declaration impugning J. so she could get sole custody of Doe. A. said she refused, and K. became "furious."

### 3. Dr. Washington's Testimony

Psychologist Anna Washington testified as an expert on child sexual abuse and CSAAS. Dr. Washington explained that CSAAS was developed in the 1980s to help adults understand children who have been sexually abused. CSAAS describes a pattern

6

of behavior exhibited by many such children, which includes: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, unconvincing disclosure; and (5) recantation or retraction.

Dr. Washington emphasized that child sexual abuse typically occurs "within a preexisting trusted relationship." She explained that perpetrators are commonly known to the child, and "may develop sort of a parent/child relationship or some other positive relationship prior to then introducing vague or ambiguous touches that then lead into more invasive touches over time."

Dr. Washington explained that children who have experienced sexual abuse often take months or years to disclose the abuse, and may then make incremental disclosures, "sharing little bits and pieces of information at a time." She added that children who have experienced chronic sexual abuse may have difficulty recalling "peripheral details," such as specific dates, but "they are quite good at recalling core details."

Dr. Washington estimated that "roughly 80 percent of sexual abuse cases are perpetrated by someone who is a known and trusted adult, so usually someone in the family system." Speaking to the unfortunately common nature of child sexual abuse, Dr. Washington estimated that "roughly, say, one in four girls, one in five boys will be sexually abused before they reach 18." Dr. Washington said she had not met Doe and had not read reports or otherwise acquired any information concerning the facts of the case. Rather, she said she was only there to educate jurors on the general topic of CSAAS.

B.    *The Defense*

Defendant advanced two lines of defense at trial. First, he suggested he could not have committed offenses against Doe because he lacked any opportunity to do so. He presented testimony from numerous witnesses, including himself, that he was continuously employed during the relevant period and frequently travelled for work,

7

sometimes for weeks at a time. Other witnesses testified that, when home, defendant was busy coaching Ha.'s sports teams and would have had no time to babysit Doe or take her to the grocery store.

Second, defendant mounted an attack on Doe's credibility. Several witnesses testified Doe had a poor reputation for truthfulness and honesty. Other witnesses testified Doe was caught in the middle of an ugly custody dispute between J. and K., which may have given her a reason to lie. Still other witnesses challenged specific details of Doe's testimony. For example, several neighbors testified they had never known defendant to park the trailer alongside the house, and neighborhood CC&Rs would have prohibited him from doing so in any event. Another witness testified the space between the front and backseats of defendant's truck was too tight to allow a person sitting in the driver's seat to reach back and touch another person sitting in the back, as Doe had alleged. We summarize other relevant defense testimony below.

### 1. Dr. Roeder's Testimony

Dr. Eugene Roeder, a forensic psychologist, testified for the defense. Dr. Roeder explained that he conducted an evaluation of defendant pursuant to *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*) to determine whether he possessed any of the characteristics of someone who would engage in sexually deviant behavior.[5] Dr. Roeder concluded defendant did not display any such characteristics. However, Dr. Roeder allowed that this conclusion did not necessarily mean that defendant was innocent or telling the truth.

### 2. H. and Ha.'s Testimony

Defendant's wife and son, H. and Ha., each testified that Doe was only an occasional visitor to the El Dorado Hills house. H. estimated that Doe came over less than once a month and was always accompanied by her younger brothers. Ha. estimated

---

[5] These characteristics include drug or alcohol abuse, antisocial or narcissistic personality disorders, sadism, and masochism.

8

that Doe came to the house once every three or four months, usually for holidays or family gatherings. Both testified defendant maintained a grueling work schedule, with long days and frequent travel. Thus, they suggested, Doe and defendant were rarely in the same place at the same time.

Turning to Doe's specific allegations, H. and Ha. testified that defendant never babysat Doe and would have been unlikely to have gone to the grocery store with her. H. and Ha. acknowledged owning a trailer during the relevant period, but both asserted the trailer would never have been parked alongside the house, as Doe maintained.

H. testified that Doe had been to the cabin near Lake Tahoe only once when defendant was present. Ha., for his part, testified that Doe visited the family cabin "a handful of times." H. recalled that J. and A. and their children (including Doe) were going skiing with another family and stopped by to say hello. She estimated the visit lasted 20 to 30 minutes. She said the children would not have gone upstairs to watch a movie, as they would not have had the ability to do so. Ha. said there was never an occasion where a group of children were lying in a bed together under the covers, and Doe never yelled "ow" or "stop."

H. said Doe did not accompany defendant on the drive home from Lake Tahoe. Ha. remembered riding in defendant's truck with Doe on one occasion, but they were not driving to or from Lake Tahoe, and Ha. did not see anything unusual or inappropriate.

H. testified that Doe's visits stopped entirely—or almost entirely—after J. and A. separated in April 2016. From April 2016 through March 2017, H. said Doe came to the house only once, on March 26, 2017.[6] Ha.'s testimony was much the same. Thus, they suggested, defendant could not have touched Doe on November 16, 2016, as alleged. In any case, H. said defendant was working that day.

---

[6] We will say more about this visit in a moment.

9

H. suggested that November 2016 was important for another reason. According to H., it was then that a water leak was discovered in the kitchen in the El Dorado Hills home. The leak necessitated extensive repairs and remodeling, and the kitchen was "completely demoed and gutted down to the studs." As a result, H. said, Doe would not have been able to use the kitchen to prepare snacks for her brothers.

H. and Ha. each recalled that Doe visited the El Dorado Hills house for the last time on March 26, 2017. H. was planning to take Doe's younger brothers to the movies that day. According to H., Doe was "begging" to go, despite having disclosed the alleged abuse only days before. H. was shocked when she learned about Doe's allegations a short time later. She had seen nothing to suggest that Doe was afraid of defendant or reluctant to go to the house.

H. denied that defendant ever fell to his knees crying and shaking upon being confronted by A. H. and Ha. both denied staying at A.'s apartment in an attempt to hide from law enforcement. H. acknowledged being estranged from A. over Doe's allegations, and she asserted Doe has a history of lying and taking things that do not belong to her.

### 3. Defendant's Testimony

Defendant testified on his own behalf. He denied touching Doe inappropriately. He emphasized that he was away from home much of the time, and thus lacked the opportunity to molest Doe. Defendant also emphasized that some of Doe's testimony was inconsistent with other facts said to have been established by the defense, such as the location of the camping trailer, the narrowness of the gap between the driver's seat and passenger's seat of his truck, and the state of the kitchen in November 2016.

Defendant preemptively testified on direct examination that he had an unusual encounter with A. in 2009. Defendant explained that he had gone out for drinks with A. and A.'s friend, G. They went to a café and listened to a band, and then went to a club. Afterwards, defendant and A. dropped G. off and then went to defendant's home.

10

Defendant said he went to Ha.'s room, because he did not want to disturb H, who was asleep. Defendant made his way to Ha.'s twin bed in the dark. He got into bed and found that A. was already there. A. got up and left. There was never any suggestion, at that time, that defendant had done anything inappropriate to A.

## C.    Prosecution Rebuttal

The prosecution presented rebuttal evidence from A. A. testified that defendant had been inappropriate with her when she was 23 years old.[7] She recalled going out with defendant and a friend in July 2009. They were celebrating defendant's birthday, A. said, and all were drinking. Defendant and A. dropped the friend off at the end of the evening. They went to defendant's home, and A. crawled into Ha.'s twin bed.[8] Moments later, defendant entered the room in his underwear and climbed into bed with her. A. recalled that she was initially lying on her back, and defendant touched her chest. She then rolled onto her stomach, and defendant touched her bottom. He then fell asleep. A. got up and left the house. The next day, she received a text message from defendant asking her not to tell H. what happened.

## D.    Defense Surrebuttal

In surrebuttal, defendant's sister and two sisters-in-law testified that the episode involving defendant and A. in Ha.'s bed was well known within the family and understood to have been an amusing anecdote, rather than evidence of anything untoward.

---

[7] A. was born in 1986.

[8] Ha. was apparently not home that night.

*E.*     *Amendments to Information and Dismissal of Count 5*

After the parties rested, the prosecution moved to amend the information to conform to the evidence. The prosecution amended counts 3, 4, and 9 by interlineation as described *post.* The prosecution dismissed count 5 (the tongue licking incident).

*F.*     *Verdict and Sentence*

Following closing arguments and jury instructions, the jury found defendant guilty on all remaining counts. A sentencing hearing was held in November 2021. Prior to sentencing, the prosecution moved to dismiss count 1 (continuous sexual abuse) to avoid multiple convictions as proscribed by section 288.5, subdivision (c). The trial court granted the motion over defense objection.

The trial court then sentenced defendant to 16 years in state prison, consisting of the upper term of eight years on count 2, four consecutive terms of two years (one-third the midterm) on counts 3, 4, 6, and 7, along with concurrent terms of six years on counts 8 and 9. The trial court said very little about its reasons for choosing the upper term on count 2. The trial court indicated only that the court had considered the probation report, which identified two aggravating factors (the particular vulnerability of the victim, and the fact that defendant took advantage of a position of trust and confidence) and one mitigating factor (that defendant had no prior criminal record). The trial court said the aggravating and mitigating factors identified in the report "appear to be accurate," and former outweighed the latter.

Defendant filed a timely notice of appeal.

## II. DISCUSSION

*A.*     *Exclusion of Evidence Bearing on Doe's Credibility*

Defendant argues the trial court erred in excluding two items of evidence bearing on Doe's credibility: (1) evidence Doe made inconsistent statements in an unrelated CPS investigation; and (2) evidence Doe stole A.'s computer and cellphone. He contends the case came down to a credibility contest between Doe and himself, and there was a

reasonable possibility the result would have been different had the evidence been admitted. He further contends exclusion of the evidence violated his fundamental right to present evidence and confront witnesses. We perceive no error.

### 1. Additional Background

Prior to trial, defendant moved in limine to admit evidence that Doe made inconsistent statements in an unrelated CPS investigation in 2011. Specifically, defendant sought to introduce evidence that Doe initially told investigators she had seen her mother perform oral sex on her boyfriend, and later said she had not seen such acts. This evidence, defendant said, was relevant both to cast doubt on Doe's credibility and show that Doe's mother, K., may have directed Doe to change her story.

The prosecution objected under Evidence Code section 352, arguing the evidence would confuse jurors and invite them to speculate about the reason for the CPS investigation. The prosecution also argued the evidence was remote and unreliable, given that Doe was only six years old at the time of her statements. The trial court reserved ruling on the motion.

The issue came up again during defense counsel's cross-examination of Doe. Defense counsel asked Doe whether she ever told an investigator that she had watched K. perform oral sex on a boyfriend. The prosecution objected, and the trial court sustained the objection. The trial court also sustained an objection to defense counsel's questions about whether Doe had stolen A.'s laptop computer.

Both objections were discussed further in a chambers conference outside the presence of the jury. With respect to the CPS investigation, defense counsel argued Doe lied when she said she had seen K. engaged in oral sex, "which is important in this case because this is all about credibility." With respect to the laptop, defense counsel made an offer of proof that A. had filed a police report alleging Doe stole the laptop and cellphone. The incident evidently spawned civil litigation in which Doe provided a declaration averring they were gifts. Defense counsel anticipated A. would testify that

13

Doe's declaration was false, which would tend to show that Doe has "a pattern of lying." Thus, defense counsel argued, the evidence was "crucially important."

The trial court was not persuaded. In the trial court's view, the evidence concerning Doe's statements in the CPS investigation had "very little probative value to the issues in this case." The trial court reasoned the evidence would involve jurors in an unrelated credibility contest, causing prejudice and confusion. Turning to the laptop computer and phone, the trial court suggested that evidence, too, would lead to another "she said, she said" credibility contest. Accordingly, the trial court stood by its earlier rulings.

The laptop computer and cellphone came up again during the cross-examination of A. During a bench conference, defense counsel indicated he was prepared to ask whether A. had a good opinion of Doe's credibility. If she answered yes, defense counsel would ask about the police report alleging the theft of the laptop and phone. The prosecutor objected under Evidence Code section 352 and the trial court again sustained the objection.

2. *Analysis*

A trial court "has broad discretion under Evidence Code section 352 'to exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 60; *People v. Gurule* (2002) 28 Cal.4th 557, 619 [trial courts have broad discretion to admit or exclude evidence offered for impeachment on a collateral matter].) "An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest

14

miscarriage of justice." ' " (*People v. Merriman, supra,* at p. 74.)  Defendant fails to make any such showing.

We begin with the trial court's decision to exclude evidence concerning Doe's statements to CPS investigators.  As noted, the trial court found the evidence had "very little probative value to the issues in this case."  We see no abuse of discretion.  The trial court could reasonably conclude that statements made to CPS investigators 10 years earlier, when Doe was six, would be unlikely to shed meaningful light on Doe's credibility at the time of trial, when she was 16.  (See, e.g., § 1127f [recognizing that children may perform differently as witnesses than adults and requiring instruction on evaluating the testimony of a child under 10 upon request of a party].)  Likewise, the trial court could reasonably conclude the evidence would be unlikely to assist jurors in assessing Doe's credibility at the time of trial but would enmesh them in collateral credibility issues involving sensitive allegations.  These allegations would not only require undue consumption of jury time, they would also pit K.'s credibility against that of her minor child.  Under the circumstances, the trial court could reasonably believe the probative value of the proffered evidence (if any) was substantially outweighed by the probability that its admission would necessitate the undue consumption of time and create a substantial danger of undue prejudice.  (Evid. Code, § 352.)  No abuse of discretion appears.[9]

We reach the same conclusion with respect to the evidence concerning A.'s laptop and cellphone.  Although the evidence was recent, it was wholly collateral to the question whether defendant molested Doe.  What's more, the evidence appears to have been

_____

[9] Defendant encourages us to undertake a "comparative analysis" of the trial court's exclusion of evidence concerning Doe's statements to CPS investigators in 2011 and its admission of evidence that he behaved inappropriately towards A. in 2009.  We do not consider the evidence comparable.

inconclusive: A. said Doe stole the laptop and phone, Doe said she did not. As the trial court observed, the evidence amounted to a "she said, she said" situation. Such a swearing match would produce little, if any, enlightenment on the real issues in the case. It would, however, prolong an already lengthy trial. The trial court acted within its discretion in excluding the evidence.

Having concluded the trial court's rulings were not an abuse of discretion, we further conclude defendant's fundamental rights were not violated. (*People v. Johnson* (2022) 12 Cal.5th 544, 607; *People v. Panah* (2005) 35 Cal.4th 395, 484, fn. 32.) "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834; *People v. Gurule, supra,* 28 Cal.4th at p. 620.) Moreover, "not every restriction on a defendant's cross-examination violates the Constitution." (*People v. Sanchez* (2016) 63 Cal.4th 411, 450.) Here, given the remoteness of Doe's statements to CPS investigators, and the absence of conclusive evidence she stole from A., the trial court's rulings could not have violated defendant's constitutional rights.

Defense counsel had ample opportunity to challenge Doe's credibility. Defense counsel cross-examined Doe on inconsistencies between her testimony and MDI statements. Defense counsel also adduced testimony from various witnesses that Doe had been coached to lie by K., that she had a poor reputation for truthfulness and honesty, and that she stole. On the record before us, we are satisfied the trial court's rulings did not deprive defendant of his due process right to present evidence or constitutional right to confront and cross-examine witnesses. (See *People v. Ardoin* (2011) 196 Cal.App.4th 102, 121 [no violation of confrontation clause where defense had "both the opportunity and the evidentiary substance to thoroughly challenge [witness's] credibility without the excluded evidence"], disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

*B.*     *CSAAS Evidence*

Defendant advances three contentions concerning the use of CSAAS evidence. First, he argues the evidence was unnecessary, because the behavior of children who have been victims of sexual abuse has become common knowledge, and jurors no longer need expert testimony to explain why children might delay disclosure or offer inconsistent accounts of abuse. Second, he argues Dr. Washington's testimony included statistics that amounted to impermissible "general" testimony about child sexual abuse. Third, he argues the jury was improperly instructed with CALCRIM No. 1193. These contentions lack merit.

*1.*     *Admission of CSAAS Evidence*

Prior to trial, the prosecution filed a motion in limine requesting permission to introduce CSAAS evidence. The court allowed the evidence over defense objection, taking care to say that Dr. Washington would only be allowed to testify about CSAAS "in the general sense that's allowed by CALCRIM [No.] 1193." Dr. Washington testified as described *ante*. No error appears.

A trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision will not be reversed on appeal unless a manifest abuse of discretion is shown. (*People v. McDowell* (2012) 54 Cal.4th 395, 426; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).) "Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' [Citations.] CSAAS testimony is permitted ' "to explain the emotional antecedents of abused children's seemingly self-impeaching behavior," ' such as delayed disclosure of the abuse. [Citations.] An expert's explanation of CSAAS 'is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a

17

delay in reporting—is inconsistent with his or her testimony claiming molestation.' " (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*).)

The admissibility of CSAAS evidence is subject to recognized limits. CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*McAlpin, supra,* 53 Cal.3d at p. 1300; see also *People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*) [" 'The expert is not allowed to give an opinion on whether a witness is telling the truth' "].) Nor may an expert present " 'predictive conclusions.' " (*Julian, supra,* at p. 886.) The expert may not "give ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' " (*Id.* at p. 885.)

### 2. *Need for CSAAS Evidence*

Defendant argues CSAAS was unnecessary because today's jurors are aware of child sexual abuse and no longer require expert testimony to understand the phenomenon of delayed reporting or a victim's desire to preserve his or her relationship with an abuser. While recognizing that CSAAS evidence has long been admissible in California (see, e.g., *McAlpin, supra,* 53 Cal.3d at pp. 1300-1301; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394), defendant urges us to reconsider the issue in light of the public's current understanding of child sex abuse. We decline to do so.

Expert opinion is admissible when the opinion is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) " 'The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one

18

of such common knowledge that men [or women] of ordinary education could reach a conclusion as intelligently as the witness." ' " (*McAlpin, supra,* 53 Cal.3d at pp. 1299-1300.)

Dr. Washington testified she regularly comes into contact with adults who hold misconceptions about how children act as victims of sexual abuse. CSAAS is admissible for the purpose of dispelling such misconceptions, and the trial court could reasonably conclude that expert testimony regarding CSAAS would "assist" jurors (Evid. Code, § 801, subd. (a)), even if they were not "wholly ignorant" of the subject matter. (*McAlpin, supra,* 53 Cal.3d at p. 1299.) The trial court acted within its discretion in admitting the evidence.

### 3. CALCRIM No. 1193

Defendant argues the trial court improperly instructed the jury with CALCRIM No. 1193.[10] Although not entirely clear, he appears to argue CALCRIM No. 1193 improperly allows the jury to consider CSAAS testimony in evaluating the victim's credibility. Specifically, he argues the instruction reinforces the "primary evils" of CSAAS testimony by allowing the jury to consider expert testimony that delayed disclosure is not inconsistent with the conduct of someone who has been molested, and allowing the jury to believe that the expert considers the victim credible. These contentions have been forfeited for failure to object to CALCRIM No. 1193 at trial. (*People v. Franco* (2009) 180 Cal.App.4th 713, 719 ["Generally, a party forfeits any

---

[10] The jury was instructed as follows: "You have heard testimony from Dr. Anna Washington regarding child sexual abuse accommodation syndrome. Dr. Washington's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not J. Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

19

challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court"].) In any case, they lack merit.

CALCRIM No. 1193 does not allow the jury to use CSAAS evidence for an improper purpose. CALCRIM No. 1193 informs jurors that they may use CSAAS evidence to evaluate whether the alleged victim's behavior, which may appear to the untrained eye to have been inconsistent with being molested, was actually not inconsistent. "CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.) "Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Ibid.*) As given here, CALCRIM No. 1193 allowed jurors to use CSAAS evidence to determine whether Doe's behavior was "not inconsistent" with the allegations and did not allow them to determine from Dr. Washington's testimony alone whether Doe was telling the truth. Jurors were still required to determine for themselves whether Doe's testimony was credible, such as by assessing her demeanor or looking for corroboration from other evidence. (*People v. Gonzales, supra,* at p. 504.) No error appears.

### 4. Use of Statistical Expert Testimony

Defendant next argues the trial court erred in allowing Dr. Washington to testify to certain statistics involving CSAAS. This argument, too, has been forfeited on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 433.) Though defendant generally objected to CSAAS evidence before trial, he said nothing about the use of statistical evidence and made no attempt to argue Dr. Washington's testimony was likely to invade the province of the jury. Defendant's general pretrial objection to CSAAS evidence was not specific enough to enable the trial court or the prosecution to anticipate or address the arguments

20

raised here. (*Id.* at p. 435.) Defendant's challenge to Dr. Washington's statistical evidence is therefore forfeited. Regardless, the argument fails.

Defendant primarily targets Dr. Washington's testimony that 80 percent of sexual abuse cases are perpetrated by "a known and trusted adult." He argues Dr. Washington's testimony improperly narrowed the range of potential suspects and gave Doe's testimony undeserved credibility. We disagree. Dr. Washington's testimony was obviously meant to counter the misconception that sexual abuse cases are typically perpetrated by strangers. (See, e.g., *McAlpin, supra,* 53 Cal.3d at p. 1303 [prosecution's expert could permissibly testify "that in most cases the child molester is not in fact a stranger to his victim"].) No reasonable juror would have understood Dr. Washington to suggest that defendant was most likely guilty of molesting Doe, given that he was well known to her. Jurors would have readily understood that defendant may number among the population of non-strangers who commonly commit abuse, yet not himself be guilty of abuse.

Defendant also takes aim at Dr. Washington's testimony that "roughly . . . one in four girls [and] one in five boys" will be abused by the time they reached the age of 18, and 20 percent of child sex abuse cases are unreported. Relying on *Julian, supra,* defendant argues Dr. Washington's testimony allowed jurors to apply the characteristics of CSAAS to the facts of the case and conclude he was guilty as a matter of statistical probability. *Julian* does not help defendant.

In *Julian,* the prosecution's CSAAS expert testified at length concerning the incidence of false allegations of child sexual abuse, citing studies that they " 'don't happen very often,' " and range from one to eight percent of all cases. (*Julian, supra,* 34 Cal.App.5th at pp. 883-885.) The Court of Appeal concluded the expert's testimony went beyond the proper scope of CSAAS evidence, and defense counsel was ineffective in failing to object to it. (*Id.* at pp. 880-881.) But *Julian* was specifically concerned with statistical evidence that the victim's allegations were false, which invited jurors to presume the defendant was guilty based on a statistical probability, rather than the

21

evidence presented in the case. (*Id.* at p. 886; see also *People v. Wilson* (2019) 33 Cal.App.5th 559, 569-571 [statistical evidence suggesting to jury there was an overwhelming likelihood the victim's testimony was truthful, which invaded the province of the jury].) *Julian* does not disapprove of all statistical evidence in CSAAS testimony. (See *Sedano, supra,* 88 Cal.App.5th at p. 482 ["Statistical probabilities are not inherently suspect when it comes to explaining CSAAS"].)

Nothing in the record suggests Dr. Washington's testimony exceeded the limits set by *Julian.* Unlike the CSAAS expert in *Julian*, Dr. Washington said nothing about the likelihood that allegations of child sexual abuse may turn out to have been false. Rather, Dr. Washington testified to the percentage of sexual abuse cases committed by a trusted adult, the percentage of children who have experienced abuse by the time they turn 18 years old, and the percentage of children who do not report abuse. These statistics were relevant to the CSAAS components of secrecy and delayed disclosure, and would have helped jurors assess Doe's credibility by making them less likely to disbelieve her solely because she had a preexisting relationship with defendant and delayed disclosure. None of Dr. Washington's statistical evidence encouraged jurors to presume defendant was guilty as a matter of mathematical probability.

## C.     *Admission of A.'s Rebuttal Testimony*

Defendant argues the trial court erred in admitting A.'s rebuttal testimony. He argues the trial court erred in finding Dr. Roeder's opinion testimony opened the door to A.'s rebuttal testimony, and abused its discretion in admitting the evidence under Evidence Code sections 1108 and 352. These arguments are unavailing.

### 1.     *Additional Background*

Defendant moved in limine to exclude A.'s testimony that he touched her inappropriately after a night of drinking in 2009. Defendant argued touching an adult is not analogous to touching a child, and the evidence should be excluded as more prejudicial than probative pursuant to Evidence Code section 352. The prosecutor

countered that the evidence was admissible under Evidence Code section 1108, and any risk of prejudice was blunted by the fact that the evidence would be less inflammatory than the testimony concerning the charged offenses. The trial court took the issue under submission, reserving ruling to hear more details from Doe's testimony.

The issue came up again by way of a supplemental motion in limine, which was filed by the prosecution before A. took the stand to testify. The prosecution argued A.'s testimony was relevant to show defendant touches vulnerable female family members without their consent and would not require undue time or create a substantial risk of undue prejudice. Defendant responded that the alleged touching of an adult was not analogous to the alleged touching of a child, and the evidence was more prejudicial than probative under Evidence Code section 352. Following an Evidence Code section 402 hearing, the trial court excluded the evidence, finding the prejudicial effect outweighed the probative value, but noting, "It's a very close call." A. testified in the prosecution's case-in-chief without referring to the 2009 incident.

During the defense case, Dr. Roeder testified he conducted a *Stoll* evaluation and determined that defendant does not possess any of the characteristics of someone who would engage in sexually deviant behavior. Other defense witnesses testified that they had known defendant for a long time and did not consider him capable of committing the charged offenses.

The prosecutor then renewed his motion to admit A.'s testimony concerning the 2009 incident. The trial court took the issue under submission and reversed its ruling the next day. The trial court explained: "[W]hen I excluded the testimony on this issue regarding the alleged sexual assault upon [A.], I said it was a very close call, and it was. I think Dr. Roeder's testimony tipped the balance from excluding it pursuant to [Evidence Code] section 352 to letting it be admitted." The trial court admitted the evidence pursuant to Evidence Code section 1108 and A. testified in the prosecution rebuttal case as described *ante*.

23

*2.     Analysis*

Defendant argues, first, that the trial court erred in finding Dr. Roeder's testimony opened the door to A.'s rebuttal testimony. We do not necessarily disagree. (*People v. Felix* (1999) 70 Cal.App.4th 426, 431-432 [Evid. Code, § 1102 does not authorize the admission of specific instances of conduct].) However, the trial court also found the evidence was admissible under Evidence Code section 1108. Defendant argues, second, that the trial court abused its discretion in so finding. It is at this point that we part company with defendant.

Evidence Code section 1108 "allows evidence of the defendant's uncharged sex crimes to be introduced in a sex offense prosecution to demonstrate the defendant's disposition to commit such crimes." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009.) "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*People v. Cordova* (2015) 62 Cal.4th 104, 132.) Evidence Code section 1108 reflects a legislative determination that " 'evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101.' " (*People v. Britt* (2002) 104 Cal.App.4th 500, 505-506, italics omitted.)

" 'To be admissible under Evidence Code section 1108, "the probative value of the evidence of the uncharged crimes 'must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.]" [Citation.] "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount

of time between the uncharged acts and the charged offense.  The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." [Citation.]  "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." ' "  (*People v. Robertson* (2012) 208 Cal.App.4th 965, 990-991.)

"A challenge to admission of prior sexual misconduct under Evidence Code sections 1108 and 352 is reviewed under the deferential abuse of discretion standard and will be reversed 'only if the court's ruling was "arbitrary, whimsical, or capricious as a matter of law.  [Citation.]" [Citation.]' [Citation.]  'We review the correctness of the trial court's ruling at the time it was made, . . . and not by reference to evidence produced at a later date.' "  (*People v. Robertson, supra,* 208 Cal.App.4th at p. 991.)

Defendant argues A.'s testimony had little probative value because she was an adult at the time of the incident, while Doe was a child at the time of the charged offenses.  According to defendant, a "vast difference" exists between the incident involving 23-year-old A. and those involving six-to 12-year-old Doe.  That may be so, but the difference does not establish an abuse of discretion.

Despite the age difference between victims, the uncharged offense involving A. was sufficiently similar to the charged offenses involving Doe to have probative value regarding defendant's propensity to commit sexual offenses.  Both victims were young and vulnerable.  Both were close, nonbiological family members.  And both described the same type of touching or groping, in the same type of domestic setting.  The trial court could reasonably conclude A.'s testimony constituted probative circumstantial evidence of defendant's propensity to sexually abuse young female relatives.  (See, e.g., *People v. Escudero* (2010) 183 Cal.App.4th 302, 311 [evidence of uncharged offenses against adult

25

victims had "substantial probative value" in case involving young minor victim "despite the differences in the ages of the females"].)

Defendant argues the uncharged conduct evidence was too remote to have significant probative value. Although the seven year gap between charged and uncharged offenses could be characterized as substantial, there is no bright line rule regarding when a prior act should be considered too remote to be admissible under Evidence Code section 352. (*People v. Branch* (2001) 91 Cal.App.4th 274, 278, 281 [uncharged sexual acts committed over 30 years before charged offenses were properly admitted under Evidence Code sections 1101 and 1108]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [uncharged sexual acts that occurred 20 years before charged offenses were not too remote for purposes of Evidence Code section 352].) The trial court could reasonably conclude the uncharged offense was not excessively remote, given the parallels to the charged offenses. The trial court could also reasonably conclude that A.'s testimony posed little risk of confusing the jury or consuming undue time. No abuse of discretion appears.

D.     *Counts 3, 4, and 9*

Defendant next challenges his convictions on counts 3, 4, and 9. He argues his due process rights were violated with respect to counts 3, 4, and 9 because he did not receive sufficient notice of the underlying charges. He also argues the evidence was insufficient to support the conviction with respect to count 9. We reject these arguments.

1.     *Due Process*

We begin with defendant's contention that he received insufficient notice of the charges in counts 3, 4, and 9. As we shall see, the contention has been forfeited. In any event, his due process rights were not violated, and no prejudice occurred.

a.     *Additional Background*

On January 15, 2019, the El Dorado County District Attorney filed a complaint charging defendant with one count of continuous sexual abuse. (§ 288.5.) Sergeants

26

Blake Braaflaet and Anthony Prencipe of the El Dorado County Sheriff's Office testified at the preliminary hearing on October 3, 2019.

Sergeant Braaflaet testified he interviewed Doe on March 30, 2017. Doe estimated defendant touched her inappropriately 10 to 15 times. She told Braaflaet about an incident involving juice at the grocery store, an incident involving a movie near Lake Tahoe, and an incident in El Dorado Hills in November 2016. With respect to the November 2016 incident, Doe reported that she was babysitting her younger brothers at defendant's house and went to get them a snack. Defendant summoned her to a nearby bedroom, put his hands down her pants, and touched her vagina. On cross-examination, Braaflaet added that Doe reported an incident in a trailer parked alongside defendant's home.

Sergeant Prencipe observed Doe's MDI in May 2017.[11] Like Sergeant Braaflaet, Prencipe testified Doe estimated defendant touched her inappropriately 10 to 15 times. The first incident took place outside the grocery store when she was seven years old. A second incident took place around the same time in a trailer parked alongside defendant's house, and involved defendant touching Doe's vagina and buttocks. Another incident took place in a cabin near Lake Tahoe.

Sergeant Prencipe testified most of the incidents took place in defendant's bedroom in El Dorado Hills. According to Prencipe, defendant "would normally start on the outside of the clothing, and he would put . . . his hand underneath the clothing and touch her vagina." The last time defendant touched Doe was when she was 12, "right after her birthday."[12] On this occasion, Doe said she went to defendant's house to "watch a movie and forgot her sweater inside." She went inside, and defendant grabbed

---

[11] Prencipe was a detective with the El Dorado County Sheriff's Office at the time.

[12] As noted, Doe's birthday is in March.

her and started pulling her into the bedroom. Doe fell over and then ran out of the house. Prencipe did not remember Doe saying anything about an incident in November 2016.

The trial court held defendant to answer to the charge of continuous sexual abuse of a minor (§ 288.5), but declined to issue a holding order on any other charges. The trial court stated: "[T]he People are free to file charges on the information for any counts for which evidence was presented at this preliminary hearing." The prosecution subsequently filed an information charging defendant as follows: continuous sexual abuse (§ 288.5, subd. (a)—count 1), lewd act upon a child (touching of vagina in bedroom, first time) (§ 288, subd. (a)—count 2), lewd act upon a child (touching of vagina in bedroom, second time (§ 288, subd. (a)—count 3), lewd act upon a child (touching of vagina in bedroom, other time) (§ 288, subd. (a)—count 4), lewd act upon a child (kissing tongue at grocery store in El Dorado Hills) (§ 288, subd. (a)—count 5), lewd act upon a child (touching of butt in trailer at house) (§ 288, subd. (a)—count 6), lewd act upon a child (touching of vagina at South Lake Tahoe) (§ 288, subd. (a)—count 7), forcible lewd act upon a child (her hand touching of his penis in South Lake Tahoe) (§ 288, subd. (b)(1)—count 8), and forcible lewd act upon a child (last time in bedroom and touching of vagina) (§ 288, subd. (b)(1)—count 9).

After the parties rested, the prosecution moved to amend the information to conform to the evidence. As relevant here, the prosecution amended count 3 by interlineation from "lewd act upon a child . . . touching of vagina in bedroom, second time," to "lewd act upon a child . . . touching of leg in truck." The prosecution amended count 4, "lewd act upon a child . . . touching of vagina in bedroom, other time," to "lewd act upon a child . . . touching of vagina in trailer." The prosecution amended count 9, "forcible lewd act upon child . . . last time in bedroom and touching of vagina," to "lewd act upon child . . . last time in bedroom and touching of waistline." The trial court accepted the amendments. Defense counsel made no objection.

28

### b. Analysis

At the outset, we note defendant forfeited his due process and fair notice argument by failing to object to the pleading variance in the trial court. A challenge to a variance between pleading and proof cannot be made for the first time on appeal where defendant was not injured or prejudiced by the variance. (§ 960; *People v. Amy* (1950) 100 Cal.App.2d 126, 128.) Defendant did not raise this issue in the trial court. However, he was not injured or prejudiced by the pleading variance. Accordingly, defendant's argument must be deemed forfeited. In any event, the argument also fails on the merits.

Due process requires a criminal defendant to be advised of the pending charges so he has a reasonable opportunity to prepare and present his defense. (*People v. Jones* (1990) 51 Cal.3d 294, 317.) A defendant must be prepared to defend against all offenses of the type alleged in the information which are established at the preliminary hearing to have occurred within the time frame pleaded in the information. (*Ibid.*) However, it is the transcript of the preliminary hearing, rather than the information, that gives notice of the particulars of an offense. (*Id.* at p. 312.) Generic testimony at a preliminary hearing is sufficient to place a defendant on notice that he must defend against multiple charges. (*Id.* at p. 318.)

Here, the evidence at the preliminary hearing was sufficient to put defendant on notice of the alleged lewd acts charged as amended in counts 3, 4, and 9. Sergeants Braaflaet and Prencipe each testified that defendant inappropriately touched Doe between 10 and 15 times. Most of the incidents took place in defendant's bedroom in El Dorado Hills. However, Braaflaet and Prencipe also referred to an incident in defendant's vehicle (the tongue licking incident), an incident in South Lake Tahoe, and an incident in a trailer parked alongside defendant's house. Prencipe elaborated that the incident in the trailer involved defendant touching Doe's vagina and buttocks.

Based on the evidence presented at the preliminary hearing, defendant was on notice that he had to be prepared to defend against alleged lewd acts against Doe between

29

March 2011, when she was six or seven years old, and March 2017, when she was 11 or 12 years old. He was also on notice that he should be prepared to defend against incidents in several locations, including his bedroom, trailer, and vehicle. Defendant was not entitled to notice of the specific time or place of each offense, so long as the offense occurred within the applicable limitation period. (See *People v. Jones, supra,* 51 Cal.3d at p. 317.) Defendant has not established any due process violation. But even assuming error, there was no prejudice.

Neither the specific location nor type of lewd act was material to any of the charges in amended counts 3, 4, and 9, which only required proof of acts upon the body of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying defendant's or Doe's lust, passions, or sexual desires. (§ 288, subd. (a).) Defendant's defense was that he never molested Doe at any time, and the prosecution failed to prove any of the charges beyond a reasonable doubt. Whether the information alleged that defendant touched Doe's vagina, waistline, or leg, or whether it alleged he touched her in his house, trailer, or truck, the defense would have been the same—a complete denial. Defendant suffered no prejudice from the amendments.

2. *Sufficiency of Evidence to Support Count 9*

Defendant argues in the alternative that the evidence was insufficient to support the conviction on count 9. Defendant's argument goes nowhere.

" 'In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 656-657.) In conducting this analysis, the reviewing court must "view[] all the evidence in the light most favorable to the prosecution, and draw[] all reasonable inferences in favor of the jury's findings." (*People v. Perez* (2017) 18

Cal.App.5th 598, 607.)  Under this deferential standard of review, " 'it is not a proper appellate function to reassess the credibility of the witnesses.' " (*People v. Friend* (2009) 47 Cal.4th 1, 41.)

Defendant's argument rests on an apparent discrepancy between Doe's pretrial statements and trial testimony.  Defendant observes that Doe told Sergeant Braaflaet the last incident occurred in November 2016, when she was babysitting her younger brothers.  According to Braaflaet, Doe said she went to the kitchen to prepare a snack and was summoned into a bedroom by defendant, who put his hand down her pants and touched her vagina.  During the trial, however, Doe suggested the babysitting incident was separate from the last incident.  Although she acknowledged being fuzzy on dates, she testified the babysitting incident occurred well before November 2016.  On that occasion, she said she went to the kitchen to prepare a snack and defendant summoned her to the bedroom and touched her vagina.  Doe was unclear whether the last incident occurred in November 2016 or sometime after.  The last incident, Doe said, occurred in late 2016 or early 2017, and involved defendant touching her stomach.

Defendant makes much of the purported discrepancies and lack of clarity in Doe's pretrial statements and trial testimony.  These arguments misconceive our standard of review.  "Issues of witness credibility are for the jury." (*People v. Boyer* (2006) 38 Cal.4th 412, 480, superseded by statute on other grounds.)  " ' " 'To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' " (*People v. Friend, supra,* 47 Cal.4th at p. 41.)  Defendant has not satisfied this burden.

It is true that Doe's trial testimony differed in some respects from her pretrial statements and was often unclear as to dates.  However, the jury could have credited Doe's testimony that defendant molested her on a day when she was babysitting and made use of the kitchen and also believed the babysitting incident occurred on a date

31

other than November 16, 2016, when the kitchen was gutted. The jury could have also believed the last incident occurred sometime later and involved the touching of Doe's stomach in the bedroom. No physical impossibility or falsity is apparent in Doe's testimony; therefore, we will not reject it.

## E.     *Alleged Instructional Errors*

Defendant raises three claims of instructional error. First, he argues the trial court erred in giving CALCRIM No. 316, as it was inconsistent with CALCRIM No. 1191A. Second, he argues the trial court erred in giving CALCRIM No. 361 over defense counsel's objection. Third, he argues the trial court erred in giving CALCRIM No. 1191A with respect to the incident involving A. None of these arguments demonstrates reversible error.

### 1.     *Applicable Legal Principles and Standard of Review*

" 'The trial court has the duty to instruct [the jury] on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." ' " (*People v. Alexander* (2010) 49 Cal.4th 846, 920.)

We review claims of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Waidla* (2000) 22 Cal.4th 690, 733.) " ' " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905.) A reviewing court reads the instructions as a whole to determine whether there is a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) We presume the jurors understood, correlated, and correctly applied the instructions. (*People v. Carey* (2007) 41

32

Cal.4th 109, 130.)  In assessing the probable impact of the instructions on the jury, we consider the arguments of trial counsel.  (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) With these general principles in mind, we address and reject each of defendant's arguments in turn.

### 2. CALCRIM No. 316

The trial court instructed the jury with CALCRIM No. 316 as follows:  "If you find that a witness has committed a crime or other misconduct, you may consider that fact in evaluating the credibility of the witness's testimony.  The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility.  It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."  Defendant argues CALCRIM No. 316 could only apply to him, inasmuch as evidence of alleged misconduct by Doe and others was excluded. Defendant's argument proceeds from this premise, which we will soon reject.

As previously discussed, the jury heard evidence that K. asked A. to provide a false declaration impugning J. so she could get sole custody of Doe.  Defense counsel referred to this evidence in closing argument, suggesting K. solicited perjury (§ 653f) and asserting Doe was unworthy of belief because "the apple doesn't fall far from the tree." On the record before us, we conclude CALCRIM No. 316 was warranted by the evidence that K. may have committed a crime or other misconduct.  But even accepting the premise that CALCRIM No. 316 would have been seen as applying to defendant, we perceive no error.

The jury was instructed with CALCRIM No. 1191A, in pertinent part, as follows: "The People presented evidence that the defendant committed the crimes of touching [A.] without her consent and touching J. Doe's tongue when she was around seven years old that were not charged in this case.  [¶] . . . [¶]  If you decide that the defendant committed one or both of the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and

33

based on that decision, also conclude that the defendant was likely to commit and did commit the [l]ewd and [l]ascivious [a]cts [u]pon a [c]hild, as charged here. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of [l]ewd and [l]ascivious [a]cts [u]pon a [c]hild. . . . [¶] Do not consider this evidence for any other purpose."

Defendant argues CALCRIM No. 316 was inconsistent with CALCRIM No. 1191A, as the former authorized jurors to consider other acts for the purpose of evaluating credibility, and the latter authorized jurors to consider the same evidence for propensity only. We discern no necessary conflict or reasonable probability of confusion. CALCRIM No. 316 instructed jurors they could consider evidence of other acts in evaluating defendant's credibility, but were not required to do so. CALCRIM No. 1191A instructed jurors that they could consider other acts in evaluating defendant's propensity to commit similar acts, but were, again, not required to do so. If jurors chose to consider defendant's other acts for propensity, they would no longer have the option to consider the evidence for credibility. We presume the jury understood and followed these instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

*3. CALCRIM No. 361*

The trial court instructed the jury with CALCRIM No. 361, which states: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

CALCRIM No. 361 should be given only when a testifying defendant completely fails to explain or deny incriminating evidence or claims to lack knowledge despite

34

evidence showing he could reasonably be expected to have such knowledge. (*People v. Cortez* (2016) 63 Cal.4th 101, 117.) CALCRIM No. 361 is not directed at the defendant's credibility as a witness, but to the reasonable inferences that may flow from a testifying defendant's silence when that defendant fails to explain or deny evidence against him that is peculiarly within his knowledge. (*Id.* at pp. 117-119.) Because the instruction is not directed at a defendant's credibility, a defendant's testimony that is contradictory to other witnesses' testimony or conflicts with the defendant's extrajudicial statements is not a failure to explain or deny, warranting giving the instruction. (*Id.* at pp. 117-118; *People v. Saddler* (1979) 24 Cal.3d 671, 683 [discussing substantially similar language in CALJIC No. 2.62].) Similarly, an indirect or vague answer, a failure to recall details, or implausible, bizarre, or unbelievable testimony is not a failure to explain or deny and does not warrant giving the instruction. (*People v. Cortez, supra,* at pp. 117-119; *People v. Roehler* (1985) 167 Cal.App.3d 353, 393 [discussing substantially similar language in CALJIC No. 2.62].) No evidence supported the conclusion that defendant failed to explain or deny adverse evidence. We thus agree with defendant that the trial court erred in giving CALCRIM No. 361. We will address the question of prejudice after considering defendant's next claim of instructional error.

    *4.    CALCRIM No. 1191A*

Defendant argues the trial court erred in giving CALCRIM No. 1191A with respect to the incident involving A. As noted, the trial court instructed the jury, in pertinent part, as follows: "The People presented evidence that the defendant committed the crimes of touching [A.] without her consent and touching J. Doe's tongue when she was around seven years old that were not charged in this case. [¶] . . . [¶] If you decide that the defendant committed one or both of the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the [l]ewd and [l]ascivious [a]cts [u]pon a [c]hild, as

35

charged here." According to defendant, the trial court erred because the court "made no finding on what asserted offense—section 243.4, subd. (e)(1), or some other offense— might qualify [A.]'s description as a 'sexual offense.' " We agree the trial court erred but find the error harmless.

As drafted by the Judicial Council, the first two sentences of CALCRIM No. 1191A provide: "The People presented evidence that the defendant committed the crime[s] of < *insert description of offense[s]* > _____ that (was/were) not charged in this case. (This/These) crime[s] (is/are) defined for you in these instructions." As is evident from the blank space and italicized language, the instruction is designed to include an adequate description of the uncharged offenses.

The Bench Notes to CALCRIM No. 1191A confirm this: "In the first sentence, the court must insert the name of the offense or offenses allegedly shown by the evidence. The court **must** also instruct the jury on elements of the offense or offenses." (Judicial Council of Cal., Crim. Jury Instns. (2020 ed.) Bench Notes to CALCRIM No. 1191A, p. 969.) The purpose of these requirements is self-evident. If they are not informed what the elements of the uncharged sexual offenses are, jurors cannot reasonably be expected to determine whether the defendant committed them.

Here, rather than defining the uncharged offenses or instructing the jury on the elements of those uncharged offenses, the trial court referred to "the crimes of touching [A.] without her consent and touching J. Doe's tongue when she was around seven years old." The jury was thus left to speculate what the uncharged offenses were and what was required to prove defendant more likely than not committed them. This, too, was error.

5.      *Prejudice*

Having concluded the trial court erred in instructing the jury, we next consider whether the errors were prejudicial. Defendant does not suggest the instructional errors require review under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), and we do not believe they do. Accordingly, we apply the standard of prejudice for errors of

36

state law set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (Cf. *People v. Saddler, supra,* 24 Cal.3d at p. 683 [applying *Watson* standard to instructional error involving CALJIC No. 2.62]; *People v. Jandres* (2014) 226 Cal.App.4th 340, 359 [applying *Watson* standard to instructional error involving CALCRIM No. 1191].) Applying *Watson*, we conclude there was no reasonable probability defendant would have achieved a more favorable outcome had the instructional errors not occurred.

Any harmful impact of CALCRIM No. 361 was mitigated by the language of the instruction itself. CALCRIM No. 361 applies only if the jury finds a failure to explain or deny evidence. Even then, the instruction makes clear that such a finding does not create a presumption of guilt or warrant an inference of guilt; nor does it relieve the prosecution of the burden of proving every essential element of the crime beyond a reasonable doubt; and it leaves the meaning and importance of defendant's failure to explain or deny to the jury. (*People v. Ballard* (1991) 1 Cal.App.4th 752, 756-757.)

The potential harm of CALCRIM No. 361 was further mitigated by CALCRIM No. 200, which instructed the jury in pertinent part as follows: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury followed this instruction. (*People v. Carey, supra,* 41 Cal.4th at p. 130.) Thus, had jurors found that defendant explained and denied the evidence against him, we can assume they disregarded CALCRIM No. 361 and defendant cannot have suffered any prejudice.

That brings us to CALCRIM No. 1191A. Applying *Watson,* we consider whether it is reasonably probable defendant would have obtained a more favorable outcome had the uncharged offense against A. been defined in the instruction. We find no such probability here. This was not a case where the testimony on uncharged offenses significantly outweighed the testimony on charged offenses or otherwise cast the

defendant in a different light to the jury. Contrary to defendant's suggestion, there can be no real doubt the uncharged acts qualified generally as "sexual offenses" within the meaning of Evidence Code section 1108 (see § 243.4, subd. (e)(1)), so there is no material risk the jury used unqualified conduct as propensity evidence. Consequently, there was no reasonable probability of a more favorable outcome had the jury been given a version of CALCRIM No. 1191A that named and defined the uncharged sexual offenses.

## F. Alleged Sentencing Errors

Finally, defendant argues the trial court erred in imposing the upper term on count 2 (the babysitting incident) in violation of Senate Bill 567 and section 1170, subdivision (b).[13] We agree.

### 1. Senate Bill 567

Effective January 1, 2022, Senate Bill 567 amended section 1170 to limit the trial court's discretion to impose a sentence greater than the midterm. (§ 1170, subd. (b)(1), (2), as amended by Stats. 2021, ch. 731, § 1.3.) To impose a sentence beyond the midterm, the sentence must be justified by the aggravating factors, and the facts underlying the circumstances must have been stipulated to by defendant or found true beyond a reasonable doubt, except that the trial court may rely upon certified records of conviction to find a prior conviction proven. (§ 1170, subd. (b)(1)-(3), as amended by Stats. 2021, ch. 731, § 1.3.)

The parties agree, as do we, that Senate Bill 567 applies retroactively to defendant's nonfinal case under *In re Estrada* (1965) 63 Cal.2d 740, 744-745. (*People v.*

---

[13] Defendant's opening brief also argues the trial court abused its discretion in dismissing count 1 and sentencing him on the remaining lewd act counts (counts 2, 3, 4, 6, 7, 8, and 9). Defendant appears to abandon this contention in his reply brief. In any event, the contention lacks merit. (See § 288.5, subd. (c); and see *People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1177.)

*Zabelle* (2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*).)  The parties also agree, and again, so do we, that the trial court relied on aggravating factors that were not found true in the manner now required by section 1170.  The parties disagree on the question of harmless error.

To assess harmless error, we follow the two-step analysis set forth in *Zabelle, supra,* 80 Cal.App.5th at pp. 1110-1115.  First, we must address whether "the trial court *could* have imposed the upper term sentence" (*id.* at p. 1112) consistent with the Sixth Amendment's jury trial guarantee under the standard set forth in *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*), which requires us to determine whether the jury would have found true beyond a reasonable doubt at least one of the aggravating circumstances the trial court relied on.  (*Id.* at p. 839.)  Second, we must assess whether the trial court "*would* have imposed the upper term sentence even absent the error" under the state law standard set forth in *Watson*.  (*Zabelle, supra,* at p. 1112.)  "In particular, we must consider whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error."  (*Ibid.*)  " 'A "reasonable probability" "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." ' "  (*People v. Soto* (2022) 79 Cal.App.5th 602, 610.)  Our analysis begins and ends with *Zabelle*'s first step.

The trial court relied on two aggravating factors in imposing the upper term:  the particular vulnerability of the victim, and the defendant taking advantage of a position of trust and confidence.  We cannot say either of these factors was established beyond a reasonable doubt.  The People argue Doe's vulnerability would have been found beyond a reasonable doubt given her age, which was an element of the offenses for which defendant was found guilty.  But age alone is not enough.  (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 195.)  Determining whether a victim was " '*particularly* vulnerable' " requires "an imprecise quantitative or comparative evaluation of the facts."  (*Sandoval, supra,* 41 Cal.4th at p. 840; see also *People v. Esquibel* (2008) 166 Cal.App.4th 539, 558

39

[" 'a "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases" ' "].) We cannot conclude beyond a reasonable doubt that the jury unquestionably would have found Doe to have been "particularly vulnerable." Although Doe was young, the evidence showed there were usually other family members around, and she was able to stop defendant and seek safety on several occasions. Accordingly, we cannot say beyond a reasonable doubt that the jury would have found Doe was *particularly* vulnerable had the issue been submitted to it.

Nor can we say the jury would have found beyond a reasonable doubt that defendant took advantage of a position of trust and confidence to commit the offenses. The evidence was undisputed that defendant was Doe's step-grandfather, and jurors obviously believed he found ways to be alone with her from time to time. However, the role of step-grandfather does not necessarily imply that defendant occupied a position of trust and confidence with respect to Doe. (Cf. *People v. Jones* (1992) 10 Cal.App.4th 1566, 1577 [as biological father, "defendant used a position of trust and confidence, that of a legal parent, to commit the offense"]; *People v. Clark* (1992) 12 Cal.App.4th 663, 666 [stepfather entrusted with caring for the victim occupied a position of trust and confidence].) Furthermore, the evidence that Doe was placed in defendant's care was hotly contested. Although defendant and Doe were members of the same blended family, numerous witnesses testified she was not entrusted to his care. Even A., who testified for the prosecution, was careful to say Doe was left with H., not defendant.

On the record before us, we cannot be sure the jury would have found either aggravating circumstance true beyond a reasonable doubt. Consequently, we cannot say the trial court would have issued the same sentence had it been limited to the circumstances it could properly consider. Thus, we must vacate defendant's sentence and remand for resentencing. (*Zabelle, supra,* 80 Cal.App.5th at p. 1115.) We express no opinion as to the appropriate sentence on remand.

# III.  DISPOSITION

The conviction is affirmed and the sentence is vacated.  The matter is remanded to the trial court for resentencing consistent with the recent amendment to section 1170. Following resentencing, the trial court must prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


/S/

RENNER, J.



We concur:


/S/

ROBIE, Acting P. J.


/S/

KRAUSE, J.

41